In the Matter of Benjamin F. MILLESON and Marlene Joyce Milleson, Debtors.

**Bankruptcy No. BK87–824.**

United States Bankruptcy Court, D. Nebraska.

March 8, 1988.

Michael G. Helms, of Schmid, Mooney & Frederick, P.C., Omaha, Neb., for debtors.

James R. McClymont and Larry R. Baumann, of Kelley, Scritsmier, Moore & Byrne, P.C., North Platte, Neb., for creditor, Production Credit Ass'n of the Midlands ("PCA").

## MEMORANDUM OPINION AND ORDER

JOHN C. MINAHAN, Jr.,
Bankruptcy Judge.

THIS MATTER comes before the Court on Debtors' Motion for Confirmation of Chapter 12 Plan (Fil. # 32), and Objection to that Plan (Fil. # 40). At a confirmation hearing held August 19, 1987, it was determined that a trial was necessary to resolve factual issues and a trial was originally scheduled for October 14, 1987. The trial was held on November 3, 1987. Appearing on behalf of the Debtors was Michael G. Helms of Schmid, Mooney & Frederick, P.C., Omaha, Nebraska. Appearing on behalf of the objecting creditor, Production Credit Association of the Midlands ("PCA"), were James R. McClymont and Larry R. Baumann of Kelley, Scritsmier, Moore & Byrne, P.C., North Platte, Nebraska.

Debtors, husband and wife, Benjamin and Marlene Milleson filed a Petition under Chapter 12 of the Bankruptcy Code on March 17, 1987. The PCA objected to the Plan for a number of reasons, most of which were settled prior to trial on confirmation. The PCA contends that there remain four reasons why the Plan should not be confirmed.

1. The Plan violates 11 U.S.C. § 1225(a)(5) because the PCA's claim is to be paid over an extended period of time with interest at less than the current fair market rate.

2. The interest rate payable under the Plan was not determined as of the "effective date" of the Plan as is required by 11 U.S.C. § 1225(a)(5)(B)(ii).

3. The Plan does not comply with 11 U.S.C. § 1225(a)(5)(B)(i), because the PCA will be deprived of its lien by the sale of its collateral, and the use of its cash collateral.

4. The Plan is not feasible as required by 11 U.S.C. § 1225(a)(6).

## FACTS

Debtors are in the primary business of ranching, possessing at the time of filing, 316 stock cows, 265 yearlings, steers and heifers and 3 bulls. The PCA is the primary secured creditor. It holds a lien on the machinery, cattle and land valued at approximately 130% of the PCA's claim. The original Plan proposed to pay the PCA over thirty years in annual installments at

an interest rate of 10% per year. The Plan was amended to reduce the interest payable to the PCA to 9.32% with payments to be made over a twenty-year period. Under the Plan, the Debtors can sell or dispose of the PCA's collateral and use the proceeds.

The contract interest rates under which the Debtors obtained funds from the PCA ranged from 11.35% to 12.55%. There are substantial periodic fluctuations in the cattle market, both throughout the year and from year to year. These fluctuations may range from 1% to 7% per month. Lenders of cattle loans commonly require a 50% debt to asset ratio with interest rates ranging from 10.5% to 11%. The PCA has historically required a 50% debt to asset ratio on cattle loans with a 50% to 60% margin on cow-calf operations like the Debtors' operation. At the time of trial, the PCA was lending money at 12.5% to high-risk borrowers and requiring borrowers to use 10% of the loan proceeds to purchase PCA stock. The best borrowers from the PCA received loans at 11.8%. The current cost of money to the PCA is 9%.

The Debtors presented no testimony on prevailing market interest rates. Debtors calculated the interest rate payable under the Plan to the PCA using the formula established in the case of *In re Wichmann*, 77 B.R. 718 (Bkrtcy.D.Neb.1987), as applied on the date of the originally scheduled confirmation hearing on August 19, 1987. If the *Wichmann* rate was calculated as of the date of the actual trial, November 3, 1987, a different rate would be determined.

## DISCUSSION

### Interest Rate

The interest rate or discount rate applied in Nebraska bankruptcy cases must be determined in accordance with the standards communicated by the Eighth Circuit Court of Appeals in *In Re Monnier Bros.*, 755 F.2d 1336, 1339 (8th Cir.1985), where it was stated:

> [I]n determining the discount rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period with due consideration for

the quality of security and the risk of subsequent default.

(Quoting, 5 *Collier on Bankruptcy*, ¶ 1129 at 1129–65).

This standard was reaffirmed in *United States v. Neal Pharmacal Company*, 789 F.2d 1283, 1285 (8th Cir.1986). Although these courts were interpreting subsections of 11 U.S.C. § 1129, the language of that section is, in substance, the same as 11 U.S.C. § 1225(a)(5)(B), so that *Monnier* and *Neal* have been applied to reorganizations under Chapter 12. *In re Doud*, 74 B.R. 865 (Bkrtcy.S.D.Iowa 1987); *In re Edwardson*, 74 B.R. 831 (Bkrtcy.D.N.D.1987); *In re Citrowske*, 72 B.R. 613 (Bkrtcy.D.Minn. 1987).

Although there is basic agreement among bankruptcy courts that "the prevailing market rate" is to be applied, these courts have used widely varying approaches to the determination of that rate. *Citrowske*, allowed "the interest rate which the creditor involved would charge to the debtor in the present regular loan market...." *Id.* at 617. *Edwardson* applied the "Bank's base rate for farm loans...." *Supra* at 836. The court in *Doud* held that the treasury bill rate for a maturity date comparable to the length of amortized payments under the plan, plus a 2% upward adjustment for risk factors was a simple, but accurate means of determining the market interest rate or discount rate. *Supra* at 869–870.

In the *Wichmann* decision, Judge Mahoney followed *Doud* in establishing a methodology for determining the interest rate to be paid to secured creditors in a Chapter 12 plan of reorganization. Since that decision, "treasury rate plus 2% method" has been applied in Nebraska Chapter 12 bankruptcy cases. However, in *Wichmann*, Judge Mahoney made clear that if a creditor believes that the *Wichmann* interest rate is totally inapplicable or inappropriate, the court would consider evidence concerning the special circumstances of the particular case.

In the instant case, the PCA argues that the interest rate mandated by the *Wich-*

*mann* decision is inadequate. The PCA asserts that under *In Re Monnier Bros., supra,* and *In re Southern States Motor Inns, Inc.,* 709 F.2d 647 (11th Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984), the appropriate interest rate should be determined on the basis of the rate of interest which is reasonable in light of the quality of the security and the risk of subsequent default with due consideration for the prevailing market rate for a loan of a term equal to the payout period provided for in the Plan.

Based on the evidence presented in this case at trial, this Court finds that the *Wichmann* rate of interest will not pay to the PCA the amount to which it is entitled under 11 U.S.C. § 1225(a)(5). As of November 3, 1987, the Court finds, as a question of fact, that 11 U.S.C. § 1225(a)(5) requires that the Debtors pay the PCA interest at the rate of 12.5% per annum on that portion of the PCA's claim which is secured by cattle.

### Effective Date

■ Bankruptcy Code Section 1225(a)(5)(B)(ii) requires that the amount to be paid to a secured creditor be determined as of the "effective date" of the plan. Due to the recent fluctuations in interest rates, the interest rate to be paid under the plan may vary considerably depending upon which date the court looks to in determining the market interest rate. It was argued by the Debtors that the interest rate should be determined as of August 19, 1987, which was the date on which the confirmation hearing was originally to have taken place; however, the hearing was rescheduled. The Creditor argues that the interest rate should be determined as of November 3, 1987, the date of the actual confirmation hearing.

■ There is no statutory definition of the words "effective date" as used in Section 1225(a)(5). However, the meaning may be determined by reference to Section 1227 which tells us that the "effect" of confirmation of a Chapter 12 plan is to bind various parties. This Court concludes that the terms "effective date" as used in Section 1225 means the date on which the Chapter 12 plan becomes binding on the Debtors and other parties-in-interest under Section 1227. The "effective date" of the plan must therefore be on or after the date on which the confirmation order is entered. In general, the "effective date" will be the date of confirmation. Under Section 1225(a)(5)(B)(ii), the value of property to be distributed by the trustee of the Debtors under the plan on account of an allowed secured claim must be determined as of the actual confirmation date.

### Equity Cushion

■ Under the Plan, the Debtors propose to sell cattle in which the PCA has a lien and to use the proceeds of sale. The Plan seeks to protect the PCA by providing that the equity cushion of the PCA will be maintained by the Debtors at a minimum value of 110% of the PCA's claim. The Debtors base this provision on *In re Wobig,* 73 B.R. 292 (Bkrtcy.D.Neb.1987). In that case, the court permitted the debtor to dispose of collateral and use the proceeds if the plan was amended to provide that the debtor would maintain a minimum value of sows and pigs on hand of 110% of the remaining value of the bank's allowed secured claim. The PCA vigorously objects to erosion of the equity cushion through the Debtors' use of cash collateral. In pertinent part, the Plan provides:

3.3 Secured claimants under this Plan shall retain their liens until the allowed secured claims have been satisfied as provided in this Plan. If, as to any specific secured claimant, the Debtors desire to use cash collateral, the Debtors shall be entitled to use such cash collateral if the Debtors maintain a minimum value in the remaining collateral secured to the creditor of at least 110% of the remaining balance due on the allowed secured claim. In the event Debtors use cash collateral, the Debtors shall file monthly reports of inventory and values and shall permit inspection by the secured creditor or the Trustee at any time upon reasonable notice. In addi-

tion, if the Debtors use cash collateral, any unsecured claim due the creditor shall not be discharged until the earlier of three years from the date of confirmation or payment in full of the allowed secured claim. Each creditor shall promptly release its lien upon any item of property where the claims secured by such property are satisfied as provided for in this Plan. In addition, if the Debtors desire to use cash collateral, any secured creditor requested to release its security interest in the cash collateral to be used, shall do so immediately by endorsing checks or drafts representing the cash collateral to be used upon presentation of a current monthly report of collateral remaining and values thereon showing that the Debtors have maintained a minimum value in the remaining collateral of at least 110% of the remaining balance of the claimant's allowed secured claim.

■ In bankruptcy cases, there are statutory and constitutional limitations upon depriving a creditor of its lien. The Supreme Court found the now superseded Bankruptcy Act, as amended by the Frazier–Lemke Act of 1934, to be in violation of the fifth amendment since, as applied, the Act deprived a secured creditor of certain state recognized rights which included the rights to retain its lien and to realize on the collateral by judicial sale. *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935). Section 361 of the Bankruptcy Code was derived from the fifth amendment protection of property interest as enunciated by the Supreme Court. *See,* Notes of Committee on the Judiciary, Senate Report No. 95–989, U.S.Code Cong. & Admin.News 1978, p. 5787. Section 361 introduces the concept of "adequate protection" as a mechanism for assuring that there will not be a taking of a constitutionally protected property interest without providing an adequate substitute. "Such a substitute must clearly both compensate for present value and insure the safety of the principal." *In re Mariner Industries,* 734 F.2d 426, 433

(9th Cir.1984); *In re Monnier Bros., supra* at 1339 (quoted with approval).

■ We need be cognizant that the Eighth Circuit Court of Appeals has also stated that "adequate protection" is not a standard the Bankruptcy Code uses in connection with confirmation decisions and that "the adequate protection standards apply primarily in the context of preconfirmation decisions." *See, In re Monnier Bros., Id.* at 1040. This statement, however, must be qualified by the fifth amendment and by the explicit language of 11 U.S.C. §§ 363(*l*) and 363(e). Under § 363(*l*), the debtor may use, sell or lease property under the Chapter 12 plan. Such use, sale or lease is not without limitation since § 363(e) is applicable. That subsection provides:

> Notwithstanding any other provision of this section, *at any time,* on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, *the court,* with or without a hearing, *shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.* (Emphasis added.)

The mandate of § 363(e) to the court to prohibit or condition the proposed sale or lease is applicable, as a matter of statutory construction, to disposition of property under a Chapter 12 plan. This interpretation is consistent with the language of the statute and is in deference to the fifth amendment which, of course, is applicable to protect secured creditors prior to and after confirmation of a Chapter 12 plan. Section 363 is applied in Chapter 12 cases pursuant to § 1205(b).

■ The oversecured creditor does have a perfected security interest in the equity cushion. *See, United Savings Association of Texas v. Timbers of Inland Forest Associates, Ltd.,* —— U.S. ——, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). In Section 1225(a)(5)(B), the Bankruptcy Code provides that the secured creditor shall retain the lien securing its claim. I therefore conclude that Section 1225(a)(5)(B) requires,

as a condition of confirmation, that the holder of a secured claim retain the lien in the equity cushion. This, of course, raises the issue of whether a Chapter 12 plan may be confirmed if it provides that some or all of the collateral securing a claim is to be sold free and clear of the lien. Section 363($l$) is responsive. It contemplates that the debtor may use, sell or lease property under a Chapter 12 plan. However, Section 363(e) makes clear that upon request of an entity that has an interest in property proposed to be sold, the court "shall prohibit or condition" such sale as is necessary to provide adequate protection of such interest. As a matter of statutory construction, I conclude that a Chapter 12 plan of reorganization cannot deprive a secured creditor of its lien in the "equity cushion" unless the creditor is provided adequate protection of its interest in the property proposed to be sold.

On the facts of this case, this standard is violated by the proposed erosion of the PCA's equity cushion without providing the PCA adequate protection. On a cattle loan, an essential attribute of the lien is a reasonable amount of over-collateralization. The proposed 110% level of collateralization is not sufficient because it does not provide assurance that the PCA's interest in the collateral will be adequately protected. Given the fluctuation in the price of cattle, the Court finds that it is highly probable that the PCA will become undersecured during the life of this Plan. If that were to happen, the Plan would have effectively deprived the PCA of its lien and its state created right to realize on the value of its collateral by judicial sale in the event of a default. I find that in this case, it is quite likely that a default will occur on the PCA claim.

For the reasons stated, the proposed Chapter 12 Plan is not confirmed.